UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VITO J. PERRONE,

    Plaintiff,

    v.

CITY OF EASTHAMPTON, et al.,

    Defendants.

Civil Action No. 24-30132-MGM

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 16)

July 14, 2025

MASTROIANNI, U.S.D.J.

## I. Introduction

This case arises from the Easthampton School Committee's March 2023 decision not to hire Vito J. Perrone ("Plaintiff") for the role of superintendent of schools. Dissatisfied with the School Committee's decision, Plaintiff initiated this civil action, bringing claims sounding in both state and federal law. Specifically, he alleges the Easthampton School Committee breached an employment contract (Count I); the School Committee violated the covenant of good faith and fair dealing (Count II); the City, the School Committee, Easthampton Mayor Nicole LaChapelle, and School Committee members Cynthia Kwiecinski, Megan Harvey, Benjamin Hersey, and Marin Goldstein, deprived him of the right to procedural due process secured by the 14th Amendment to the federal constitution (Counts III-VIII); and LaChapelle, Kwiecinski, Harvey, Hersey, and Goldstein violated the

Massachusetts Civil Rights Act (Counts IX-XIII).[1]

In response, Defendants moved to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). After careful consideration, the court grants Defendants' motion as to the procedural due process claims in Counts III-VIII. These claims are dismissed with prejudice. The court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, Counts I, II & IX-XIII, rendering them dismissed without prejudice.

## II. BACKGROUND[2]

In February of 2023, Plaintiff interviewed with the Easthampton School Committee for the role of superintendent. Impressed with the initial interview, the School Committee invited him for a secondary interview. The Committee then voted four to three to offer Plaintiff the position on the night of March 23, 2023. According to the minutes of the March 23 meeting, the position was offered "pending successful contract negotiations." (Dkt. No. 17-1 at 5.)[3]

At some point during the early morning hours of March 24, Defendant Kwiecinski called Plaintiff to inform him of the decision.[4] Kwiecinski told Plaintiff the position came with a salary of

---

[1] Plaintiff voluntarily dismissed Count I as to the City of Easthampton, Count II as to the City of Easthampton, and Count XIV in its entirety. (Dkt. No. 22.)

[2] Unless otherwise noted, all factual allegations are drawn from Plaintiff's operative complaint. (Dkt. No. 1.)

[3] For convenience, when citing to meeting minutes, the court will cite to their location in the ECF record. The minutes are, however, publicly available on the Easthampton town website at https://easthamptonma.gov/AgendaCenter.

[4] The March 23 meeting began at 4:45 p.m. and ended at 12:25 a.m. on the morning of March 24. (Dkt. No. 17-1 at 2, 5.) In a likely effort to avoid violating the Massachusetts open meeting laws, the School Committee remained in session after it voted to offer Plaintiff the job "pending further negotiations," while waiting to hear if Plaintiff was amenable to beginning negotiations. (Dkt. No. 17-1 at 6.) Despite repeated efforts to call Plaintiff over the course of an hour, Kwiecinski was unable to reach Plaintiff and deliver the news. (Dkt. No. 17-1 at 6.) At some point around 12:00 a.m. on March

$151,000 and a duration of three years. Plaintiff verbally indicated he would take the job. Kwiecinski then informed Plaintiff that the Committee would send him a written employment contract, "and that the School Committee and Dr. Perrone would negotiate the minor details of his employment contract on March 30, 2023." (Dkt. No. 1 ¶ 30.)  Following this discussion, Kwiecinski reported back to the Committee, "Dr. Perrone has accepted and the committee has an agreement with Dr. Perrone pending negotiations." (Dkt. No. 17-1 at 6.) Kwiecinski also noted Plaintiff sought a salary of $157,000 but had stated he could, if necessary, "find other ways to get additional money from the district." (Dkt. No. 17-1 at 6.) The School Committee then adjourned for the night. (Dkt. No. 17-1 at 5.)

Several days later, on March 28, the School Committee returned for another meeting. (Dkt. No. 17-3 at 2.) The meeting opened with Kwiecinski announcing: "pending successful negotiations [,] we have a new superintendent. Vito Perrone [,] who will start on July 1, 2023." (Dkt. No. 17-3 at 2.) The Committee then entered an executive session for purposes of discussing the written contract that would be offered to Plaintiff. (Dkt. No. 17-3 at 6.) During this session, the Committee reviewed requests Plaintiff made when discussing the verbal job offer with Kwiecinski. These requests included Plaintiff's desire "to attend the three[-]year mentorship program and the district pay[ing] for [the mentorship program] with evidence for goals to be added to the contract." (Dkt. No. 17-3 at 6.) The Committee further discussed changing all pronouns in the contract to "they/them," and an alteration to the contract provision covering the rollover of sick days. After making these changes, the Committee voted seven to zero "to approve the amended 3[-]year contract for Dr. Vito Perrone." (Dkt. No. 17-3 at 6.)

---

24, a welfare check was performed by the Easthampton Police Department, after which Plaintiff called the School Committee. As it turns out, Plaintiff was aware the School Committee would call him that night, but he had fallen asleep around 10:15 p.m. with his phone on silent. (Dkt. No. 17-2 at 8.)

3

The next day, March 29, Kwiecinski's assistant emailed the written contract to Plaintiff.[5] After reviewing the document, Plaintiff responded as follows:

> Ladies,
>
> Good evening! I perused the contract and have three requests:
>
> 1. Bullet 3 (compensation): I was told that the $151,000 initial salary was non-negotiable, and I understand the rationale behind the decision, so I request that the last sentence of the bullet read as follows: The annual salary for fiscal years 2025 and 2026 shall be negotiated, but shall not be less than a cost of living adjustment (COLA) of 3% and 3% respectively for the final two years of the contract.
> 2. Bullet 12 (Annual Vacation Days): Instead of 26 vacation days, I request 30 vacation days effective July 1 of each contract year with all other contract language remaining the same.
> 3. Bullet 13 (Sick days): I worked for six years in the EPS and accrued a reasonable number of days in sick time. I request 40 sick days effective July 1 of the FIRST year of my contract and 18 days effective July 1 of each contract year thereafter with all other contract language remaining the same.
>
> All other language and provisions are acceptable to me. Thank you!
>
> Vito

(Dkt. No. 1 ¶ 33.)

On March 30, Plaintiff logged into a Zoom meeting with the School Committee to discuss the written terms for his employment agreement. However, immediately after signing into the meeting, the School Committee asked that he log off so they could have a private discussion. Kwiecinski then addressed the other members of the School Committee in private, explaining:

> [S]he is very discouraged by the email Dr. Perrone sent in response to the committee's offer/contract. She stated addressing the email to Ladies is unprofessional and dismissive and she was insulted . . . She stated she is terrified of his behavior, she sees a major problem, and is worried of [*sic*] a procedure to terminate if needed, versus rescinding the offer now.

---

[5] Kwiecinski's assistant sent the contract in response to an email from Plaintiff asking, "[w]ill I be able to review a contract proposal before the meeting tomorrow night." (Dkt. No. 17-2 at 2.) Plaintiff neglected to include the full email thread in the complaint. However, the court finds this email from Plaintiff is of undisputed authenticity, is essential to his claims, and is fairly incorporated into the complaint. The court, therefore, considers the entire email chain, to the extent necessary, in ruling on this motion. *See Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 163 n. 4 (D. Mass. 2017).

(Dkt. No. 1 ¶ 37.)[6] This prompted Defendant Goldstein to ask about the status of the employment agreement. Kwiecinski indicated it was a "verbal agreement only." (Dkt. No. 1 ¶ 38.) Several other School Committee members argued use of the term "Ladies" constituted a "microaggression." (Dkt. No. 1 ¶ 39.)

At this point, School Committee member Laurie Garcia spoke up and urged the Committee to let Plaintiff back into the Zoom call so he could explain himself. Defendant Harvey objected, allegedly stating, "we cannot give an oppressor [] any opportunity to explain away the oppression." (Dkt. No. 1 ¶ 40.)[7] The School Committee promptly voted five to one (with one abstention) to "rescind" the decision to hire Plaintiff.

Following the vote, Kwiecinski texted Plaintiff to return to the Zoom meeting. Kwiecinski informed Plaintiff that his use of the term "Ladies" was unprofessional, dismissive to the Chair of the School Committee, and a microaggression. Plaintiff apologized for his use of the term three times. Kwiecinski, however, was not satisfied by the apology. Kwiecinski informed Plaintiff that the School Committee was not interested in hiring someone who needed to be "chastised." Plaintiff was also told a vote had been taken and he would not be the next superintendent.

### III.    LEGAL STANDARD

As this matter is before the court on Defendant's motion to dismiss pursuant to Rule 12(b)(6), the court applies the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft*

---

[6] The court understands this section of the complaint to be quoting from the March 30 meeting minutes.

[7] The court has not located this quotation in the meeting minutes docketed with the briefing, but these meeting minutes may not be a verbatim transcript of the School Committee's recorded proceedings. For purposes of this motion, applying the appropriate standard of review, the court accepts this statement as true.

*v. Iqbal*, 556 U.S. 662 (2009). Therefore, the complaint must allege "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When evaluating whether dismissal is appropriate under Rule 12(b)(6), the court must credit well-pleaded factual allegations as true and draw all reasonable inferences from those facts in the non-moving party's favor. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 36 (1st Cir. 2013). "Well-pleaded facts must be non-conclusory and non-speculative." *Barchock v. CVS Health Corp.,* 886 F.3d 43, 48 (1st Cir. 2018) (internal quotation omitted). For a claim to proceed, the complaint must allege enough facts to plausibly establish each material element of the claim and "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (citing *Twombly*, 550 U.S. at 555).

The court's review is typically limited to the allegations in the complaint, but it "may [also] consider implications from documents attached to or fairly incorporated into the complaint," *Barchock*, 886 F.3d at 48, as well as "matters of public record, and other matters susceptible to judicial notice," *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020). Here, the complaint and Plaintiff's opposition quote from selected parts of the various meeting minutes throughout, but do not provide the complete public record of the meetings dealing with Plaintiff's proposed hiring. Nevertheless, the court finds it appropriate to consider the minutes in their entirety when ruling on this motion, as the collection of minutes are official public records, fairly incorporated into the complaint, and were produced in their entirety by Defendants as attachments to the motion to

dismiss.⁸ *See Pitta v. Medeiros,* 90 F.4th 11, 14 n. 2 (1st Cir. 2024) ("On a motion to dismiss, we may consider documents which are of undisputed authenticity, official public records, central to the plaintiff's claim, or sufficiently referred to in the complaint."), *cert. denied*, 144 S. Ct. 2631 (2024); *see also Lister v. Bank of Am., N.A.*, 790 F.3d 20, 22 n. 2 (1st Cir. 2015) (affirming district court's reliance on public records referenced in complaint); *Avanru Dev. Grp., Ltd. v. Town of Swanzey, NH Zoning Bd.,* --F.Supp.3d--, No. 24-CV-103-LM, 2025 WL 1078858, at *9 (D.N.H. Apr. 10, 2025) (considering meeting minutes when deciding a motion under Rule 12(b)(6)). When, as here, a plaintiff is tactically selective in pleading the public record and documents incorporated into the complaint, this court is not bound to ignore the complete scope or contents of these documents in favor of an incomplete narrative set forth in the four corners of the complaint. *See United States ex rel. Winkelman v. CVS Caremark Corp.,* 827 F.3d 201, 207-08 (1st Cir. 2016); *see also Newman v. Lehman Bros. Holdings Inc.,* 901 F.3d 19, 27 (1st Cir. 2018) ("[T]he mere inclusion of a vague statement in the pleading does not preclude the district court's fair consideration of an incorporated, uncontested document."); *Yacubian v. United States*, 750 F.3d 100, 108 (1st Cir. 2014) ("[I]t is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."); *In re Colonial Mortg. Bankers Corp.,* 324 F.3d 12, 15-16 (1st Cir. 2003) ("The first part of this rule is consistent with the axiom that a writing is the best evidence of its contents . . . . The second part of this rule is consistent with the hoary tenet that a court may look to matters of public record in deciding a Rule 12(b)(6) motion." (internal citations and quotation marks omitted)); *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999) (explaining "[a] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment").

---

⁸ The court independently verified the minutes annexed to the motion to dismiss are publicly available using the link contained in footnote three of this decision.

7

## IV.   DISCUSSION

### A.   Procedural Due Process

Plaintiff's sole federal claim sounds in the 14th Amendment's guarantee of procedural due process. U.S. Const. amend. XIV, § 1. To state such a claim, Plaintiff must allege (1) he was deprived of a protected property interest by the state, and (2) this deprivation was accomplished without adequate process. *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008).

For purposes of a procedural due process claim, property interests arise from state law. *Santiago v. Municipality of Utuado*, 114 F.4th 25, 35 (1st Cir. 2024). The First Circuit has "held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property." *Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005). In the context of public employment, however, an employee may possess a property interest in continued employment that is created by contract. *Santiago*, 114 F.4th at 35-36. To sufficiently plead such a claim, "a public employee must first demonstrate that he has a reasonable expectation, arising out of a [state] statute, policy, rule, or contract, that he will continue to be employed." *Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 101 (1st Cir. 2002) (alteration added); *see also Santiago*, 114 F.4th at 35.

The process for employing a school superintendent is governed by Mass. Gen. Law ch. 71, § 41. This provision provides, in relevant part: "[a] school committee may award a contract to a superintendent of schools . . . for periods not exceeding six years which may provide for the salary, fringe benefits, and other conditions of employment, including but not limited to, severance pay, relocation expenses, reimbursement for expenses incurred in the performance of duties or office, liability insurance, and leave for said superintendent[.]" *Id.* (alterations added). "Section 41 vests broad discretion in a school committee to hire a superintendent and to set compensation, conditions of employment, and other benefits of employment." *O'Neill v. Sch. Comm. of N. Brookfield*, 982 N.E.2d

8

1180, 1184 (Mass. 2013). As part of this "broad discretion," school committees have exclusive power to "fix [the superintendent's] compensation." Mass. Gen. Law ch. 71, § 59 (alteration added). Given these statutory provisions, a superintendent working pursuant to a school-committee-approved contract could have a protected property interest for purposes of a procedural due process claim. *See, e.g., Devine v. Town of Hull*, No. 21-CV-11230-PBS, 2024 WL 1856987, at *6 (D. Mass. Jan. 17, 2024) ("Here, the parties agree that Devine possessed a property interest in his employment by virtue of his employment agreement.").

In this case, however, it is undisputed that Plaintiff did not sign an actual employment contract. Plaintiff nevertheless argues he had a valid contract (and a protected property interest) with the School Committee based on his communications with Defendant Kwiecinski. For several reasons, the court is not persuaded that, when the applicable motion to dismiss standard is applied, this position is supported by the law.

1. *Counteroffer*

Under Massachusetts law, "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000).[9] It is not required that "every term of the agreement be specified with precision," but the parties must progress "beyond the stage of imperfect negotiation," as "expectations and negotiations" do not suffice to establish the existence of an enforceable contract. *Lambert v. Fleet Nat. Bank*, 865 N.E.2d 1091, 1095 (Mass. 2007) (internal quotation marks omitted); *Lafayette Place Assocs. v. Bos. Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) ("We adhere to the principle that

---

[9] "Whether a purported contract contains the necessary elements for enforceability is (ordinarily) a question of law reserved for the court." *Moore v. La-Z-Boy, Inc.*, 639 F. Supp. 2d 136, 140 (D. Mass. 2009) (citing *Schwanbeck v. Federal–Mogul Corp.*, 592 N.E.2d 1289, 1293 (Mass. 1992)).

'[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto[.]'" (quoting *Rosenfield v. U. S. Tr. Co.*, 195 N.E. 323, 326 (Mass. 1935))). As relevant here, the material terms of an employment contract include the parties to the agreement, the position to be held, the salary or compensation, and the duration of the employment relationship. *Austin v. Ken's Foods, Inc.*, --F.Supp.3d--, No. 4:24-CV-40040-MRG, 2025 WL 889438, at *7 (D. Mass. Mar. 21, 2025) (citing *Ferrera v. Carpionato Corp.*, 895 F.2d 818, 822 (1st Cir. 1990)); *see also Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir. 2000) ("The amount of compensation is an essential term of an employment contract.").

Even when viewed in a light most favorable to Plaintiff, the allegations of the complaint fail to plausibly allege the parties agreed to the material terms of an employment agreement. The salary offered to Plaintiff was $151,000 a year. Rather than accept this offer, Plaintiff responded by demanding the salary for years two and three increase by, at minimum, three percent, which is an amount equivalent to several thousand additional dollars each year. This response was a counteroffer, as it was "[a] reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered." *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 89 (1st Cir. 2002) (citing Restatement (Second) of Contracts § 59 (1981)); *see also D'Agostino v. Fed. Ins. Co.*, 969 F. Supp. 2d 116, 129-31 (D. Mass. 2013). Plaintiff additionally demanded forty sick days in his first year and four extra days of vacation. These requests constituted a further alteration of the original offer in a manner consistent with a counteroffer but inconsistent with acceptance.

Plaintiff offers several unpersuasive counterarguments asserting that his responsive email of March 29 was not a counteroffer. He first attempts to characterize this email as concerning only "minor details of his employment contract," but his demand for guaranteed salary increases in the second and third years of the agreement went to the very heart of the employment agreement's most essential term—compensation. *See Sands*, 212 F.3d at 661; *see also Conway v. Licata,* 104 F. Supp. 3d 104,

113-15 (D. Mass. 2015); *cf. Kolling v. Am. Power Conversion Corp.,* 347 F.3d 11, 15-16 (1st Cir. 2003) (applying analogous provisions of Rhode Island law to reach the same conclusion).[10] Alteration of terms so essential to the contract cannot amount to "mere modification or supplementation" of the original offer, but rather must be considered tantamount to rejection. *Lambert v. Kysar*, 983 F.2d 1110, 1115 (1st Cir. 1993). The contents of Plaintiff's email further support this understanding of its purpose, as he styled the subject line "contract negotiation requests," (Dkt. No. 17-2 at 7), before specifically noting the first-year salary was "non-negotiable" but seemingly believing the next two years could be subject to negotiation. (Dkt. No. 1 ¶ 33.) He similarly indicated "[a]ll other language and provisions are acceptable to me." (Dkt. No. 1 ¶ 33.)  Phrasing the email in this manner only makes logical sense if it was intended to convey the specific three provisions discussed in the body of the email were not acceptable as written. It is apparent from the face of the complaint that there was no enforceable agreement, as Plaintiff rejected the School Committee's initial offer by responding with a counteroffer. *See Sea Breeze Ests., LLC v. Jarema,* 113 N.E.3d 355, 361 (Mass. App. Ct. 2018) (citing *Moss v. Old Colony Trust Co.*, 140 N.E. 803, 806 (Mass. 1923)); *see also D'Agostino*, 969 F. Supp. 2d at 130 (citing *Ismert & Assocs., Inc. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 541 (1st Cir.1986)). On the record before the court, there is no plausible support, whether direct or inferential, for Plaintiff's legal conclusion that an enforceable contract was created by the March 29 email.

Plaintiff next cites *Kirschling v. Lake Forest Sch. Dist.*, 687 F. Supp. 927 (D. Del. 1988), and *APB Realty, Inc. v. Georgia-Pac. LLC*, 889 F.3d 26 (1st Cir. 2018), arguing they support the legal viability of his claims. These decisions do not at all support his position. *Kirschling*, in addition to being a nonbinding discussion of Delaware law, dealt with a factually distinct scenario. 687 F. Supp. at 929, 931-32. Unlike Plaintiff, Kirschling was formally appointed to the role of principal, as evidenced both

---

[10] Plaintiff's vacation and sick day requests also went to essential terms of the agreement, as he sought the ability to take off seventy workdays in his first year on the job.

11

by meeting minutes indicating "the Board's acceptance of Mr. Kirschling's appointment," and by the Board's signing and sending of a "standard Delaware School Administrators Contract." *Id.* at 931; *see also id.* at 932 ("Dr. Lysik told him the Board had formally moved to appoint him."). Kirschling did not, moreover, respond to the written agreement he received with a counteroffer. Rather, it was undisputed Kirschling could not have responded with a counteroffer, or sought to negotiate, because his salary, vacation, and sick leave were entirely determined by statute. *Id.* at 931-32. In other words, the parties had reached an agreement on all essential terms, including salary. *Id.*

Similarly, *APB Realty* addressed a legally different scenario. In that case, Georgia Pacific received an offer to buy eighty-eight rail cars, "where is, as is," for $1,636,000. *APB Realty*, 889 F.3d at 27. Georgia Pacific responded to this offer by sending back two options, the second of which provided: "As is where is. Customer assumes responsibility for the replacement of all southern wheels if found. Customer retains responsibility for transportation to final destination. Proposed Offer: 1,636,000." *Id.* at 28. Considering this second option a mere reiteration of the original terms of the offer, the First Circuit ruled that Georgia Pacific had plausibly accepted the offer by mirroring the terms of the offer, and thus the existence of a contract was sufficiently alleged. *Id.* at 28-30. By contrast, here, Plaintiff responded with materially different terms—higher compensation and more days off—that could not be mistaken for anything but a counteroffer, as there is nothing in the complaint to suggest Plaintiff's response constituted "an acceptance of [the School Committee's] offer, plus an offer of a new, alternative deal that [the School Committee] can—but need not—accept." *Id.* at 29 (alteration added). Rather, it is apparent from reading the complaint and the documents incorporated therein that the parties, at best, had an unenforceable "agreement to reach an agreement." *Lafayette Place Assocs. v. Bos. Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998).

Accordingly, the court concludes Plaintiff has not adequately alleged an agreement as to the essential terms of the employment contract.

*2. Public Policy*

In the unique circumstances of this case, public policy also forecloses Plaintiff's theory of contract formation. Contracting with the government is not the same as contracting with a private party, as there are uniquely important interests requiring strict adherence to what, in other circumstances, might be categorized as "mere ministerial" formalities. *Park Drive Towing, Inc. v. City Of Revere*, 809 N.E.2d 1045, 1049 (Mass. 2004). Thus, "[i]t is a well-established principle that a party dealing with a city or town cannot recover if statutory requirements [] have not been observed." *Id.* (first alteration added and text in brackets omitted) And, in analogous contexts, the Supreme Judicial Court has repeatedly reiterated: "the purpose of requiring a written contract, with the signatures of certain city officials affixed thereto, is to attach a 'paper trail' to the city's contractual commitments that is capable of being scrutinized by the public, and for which municipal officials are ultimately accountable." *Id.* at 1049. Requiring strict adherence to these formalities furthers "the salutary function[] of placing cities and towns on a sound financial basis and preventing waste, fraud, and abuse." *U.S. Leasing Corp. v. City of Chicopee*, 521 N.E.2d 741, 743 (Mass. 1988) (alteration added).

Here, Massachusetts law requires strict adherence to the plain text of Mass. Gen. ch. 71, §§ 41, 59. *See McAndrew v. Sch. Comm. of Cambridge*, 480 N.E.2d 327, 329 (Mass. App. Ct. 1985). These provisions require that the School Committee fix the superintendent's salary and formally offer an approved contract, and there can be no "breach of an employment contract on common law principles" without following this process. *Id.* at 329. In accordance with this principle, the SJC has previously ruled that a school committee's vote to extend a contract is not itself the source of an enforceable agreement, as no contract arises until the "drafting and submission to the committee, and its approval, of a formal contract" through a lawful public vote. *Konovalchik v. Sch. Comm. of Salem,* 226

N.E.2d 222, 223 (Mass. 1967).[11] Any action taken without adherence to this procedure would have been without lawful authority, and an agreement reached *ultra vires* is void and unenforceable under Massachusetts law. *See Serv. Emps. Int'l Union, Loc. 509 v. Dep't of Mental Health*, 63 N.E.3d 1097, 1104 (Mass. 2016); *Conners v. City of Lowell*, 140 N.E. 742, 743 (Mass. 1923) ("A contract made by it in any other way than in strict compliance with all the prerequisites, conditions and forms prescribed . . . does not become an obligation of the city. It is a contract *ultra vires* the statutory power of the city.").

Furthermore, "[i]t is essential to a democratic form of government that the public have broad access to the decisions made by its elected officials and to the way in which the decisions are reached." *Foudy v. Amherst-Pelham Reg'l Sch. Comm.*, 521 N.E.2d 391, 394 (Mass. 1988); *see also Dist. Att'y for N. Dist. v. Sch. Comm. of Wayland*, 918 N.E.2d 796, 798 (Mass. 2009) ("No quorum of a governmental body shall meet in private for the purpose of deciding on or deliberating toward a decision on any matter except as provided by this section."). This well-founded and compelling interest in subjecting government spending decisions to public scrutiny would be undermined by allowing for the enforcement of oral agreements reached without a public vote, especially when the terms of the oral

---

[11] In *Konovalchik*, a four to three majority of the Salem School Committee voted to offer the high school's football coach a new three-year contract with a specific agreed upon salary. *Id.* at 222. The committee further voted to prepare an agreement in accordance with the terms contemplated by the first vote. *Id.* at 223. After a committee member drafted the agreement, it was brought to city hall in preparation for a vote of approval. *Id.* However, before the vote could occur, the three original dissenters took the opportunity to call the committee into session, before ending the session due to the lack of a quorum. *Id.* Undeterred by the dissolution of the formal meeting, the four members of the majority signed the contract in a back office and then acted as though a contract had been agreed to by the committee. *Id.* The SJC held that "no contract was made," as "Geary and his associates of the [earlier] majority were without authority to determine for the committee the contract terms or to submit any document or offer of contract to the plaintiff." *Id.* (alteration added). In the court's view, *Konovalchik* forecloses Plaintiff's claims in this case, as it stands for the proposition that the school committee may only act through a lawful public vote on the specific terms of a proposed employment agreement, even in circumstances "where parliamentary tactics have operated to defeat the basic intention of the committee." *Id.*; *see also* 1 Williston on Contracts § 4:9 (4th ed.) (citing *Konovalchik* as supporting the proposition that "an ordinance or resolution of a municipality does not amount to an offer since it merely evidences the municipal corporation's intent to do something in the future, but does not thereby make a promise that it shall be done").

agreement materially differ from the terms of the contract that was publicly approved in the manner required by law. Public confidence in the hiring process for school superintendents—a role of great importance in the day-to-day operation of most municipalities—would similarly diminish if committee members could agree to one set of terms on the public record, only to quietly enter verbal agreements obligating taxpayers to expend unanticipated sums as compensation. *Cf. Gattineri v. Wynn MA, LLC*, 221 N.E.3d 742, 750-51 (Mass. 2023) (explaining Massachusetts law forbids oral agreements varying publicly available contract terms because this "defeat[s] the public's confidence in [the governmental licensing] process"). The court is therefore persuaded that Massachusetts public policy requires an affirmative vote of the School Committee to accept *any* alterations to a previously offered employment agreement. As a matter of law, no enforceable contract is formed until such a vote occurs.[12]

3. *Statute of Frauds*

Finally, even setting aside the counteroffer and the need for a formal vote, the complaint still does not allege the existence of an enforceable agreement because of the statute of frauds. Massachusetts's version of the statute of frauds requires certain contracts be in writing and signed by the party against whom a breach is alleged. Mass. Gen. Law. ch. 259, § 1. Chapter 259's requirements apply to "an agreement that is not to be performed within one year from the making thereof." *Id.*; *see also Boothby v. Texon, Inc.,* 608 N.E.2d 1028, 1035-36 (Mass. 1993); *Beaupre v. Seacoast Sales, Inc.,* 507 F. Supp. 3d 353, 362 (D. Mass. 2020). The complaint alleges the employment agreement was to last for a fixed duration of three years, meaning it must be in writing and signed by the School Committee. *See Lahlou v. Daley,* 874 F. Supp. 2d 8, 11 (D. Mass. 2012). There is, however, no allegation that such a written and signed document exists.

Rather, Plaintiff contends the various emails exchanged between Kwiecinski and himself,

---

[12] This is, in fact, the process the School Committee followed on March 28. (Dkt. No. 17-3 at 6.)

15

combined with the meeting minutes, suffice to satisfy the statute of frauds. This argument might have persuasive force if Plaintiff was contracting with a private party or if the meeting minutes reflected the School Committee ever voted to approve his alterations. But, because he was contracting with the government, the court does not find it persuasive, as Kwiecinski had no authority to bind the School Committee to an agreement when acting alone and without a formal vote on the public record. *See Konovalchik*, 226 N.E.2d at 223. Moreover, as alluded to earlier, doctrines such as apparent authority and estoppel may not be deployed against the government to salvage Plaintiff's failure to satisfy the statute of frauds. *See, e.g., Park Drive Towing*, 809 N.E.2 at 1049 n. 7 (noting the SJC has repeatedly declined to allow plaintiffs to circumvent the statutory limits on municipal contracting power through application of equitable doctrines); *U.S. Leasing Corp.*, 521 N.E.2d at 744 (estoppel barred); *Adalian Bros. v. City of Bos.*, 84 N.E.2d 35, 37 (Mass. 1949) (implied contract doctrine barred); *City of Lowell v. Massachusetts Bonding & Ins. Co.*, 47 N.E.2d 265, 273 (Mass. 1943) (quantum meruit barred); *Dagastino v. Comm'r of Correction*, 754 N.E.2d 150, 152 (Mass App. Ct. 2001) ("[T]he doctrine of apparent authority does not apply to the government, its agencies, or its officials.").

For these reasons, the court concludes Plaintiff has not adequately alleged the existence of a protected property interest recognized by Massachusetts law. Accordingly, Plaintiff's procedural due process claims are dismissed with prejudice.

### B.    Supplemental Jurisdiction

Plaintiff's remaining claims—Counts I, II, and IX-XIII—all arise under Massachusetts law. The court declines to exercise supplemental jurisdiction over these state law claims in the absence of any viable federal claims. *See Sexual Minorities Uganda v. Lively*, 254 F. Supp. 3d 262, 270 (D. Mass. 2017), *aff'd in part, appeal dismissed in part*, 899 F.3d 24 (1st Cir. 2018); *see also Lambert v. Fiorentini*, 949 F.3d 22, 29 (1st Cir. 2020). These claims, therefore, are dismissed without prejudice.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part. (Dkt. No. 16.) Counts III-VIII are dismissed with prejudice. Counts I, II, and IX-XIII are dismissed without prejudice, as the court declines to exercise supplemental jurisdiction over these claims. Plaintiff's motion for an extension of time is DENIED as moot. (Dkt. No. 20). This case may now be closed.

It is So Ordered.

  /s/ Mark G. Mastroianni  
MARK G. MASTROIANNI  
United States District Judge